IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

FRIENDS OF THE CLEARWATER and
ALLIANCE FOR THE WILD ROCKIES,

                Plaintiffs,

    v.

UNITED STATES FOREST SERVICE;
VICKI CHRISTIANSEN, Chief of the
Forest Service; CHERYL PROBERT,
Forest Supervisor for the Nez Perce-
Clearwater National Forests; LEANNE
MARTEN, Regional Forester for Region 1
for the U.S. Forest Service; and NOAA-
FISHERIES,

                Defendants.

NO.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## I.    NATURE OF ACTION

1.    On July 1, 2919, the United States Forest Service approved the Lolo Insect and Disease Project  (the "Lolo Project" or "Project"), which authorizes extensive logging, burning, and road building in the Lochsa-Powell Ranger District of the Nez Perce-Clearwater National Forests.

2.    The final Record of Decision (ROD) to approve the Project under the National Environmental Policy Act was signed by then-Acting Forest Supervisor for the Nez Perce-Clearwater National Forests Kurtis E. Steele. Mr. Steele has since been replaced in that position by defendant

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

1   Cheryl Probert, who resumed her former position of Forest Supervisor for the Nez Perce-Clearwater

2   National Forests in July 2019.

3           3.      In 2018, prior to issuing the ROD, the Forest Service issued a draft and a final

4   Environmental Impact Statement (EIS).

5           4.      The ROD authorized the implementation of Alternative 5 in the final EIS, with

6   modifications.

7

8           5.      The ROD included, as Appendix B, a Biological Opinion and Incidental Take

9   Statement dated June 20, 2019 and prepared by defendant NOAA-Fisheries (also called the National

10  Marine Fisheries Service; herein, "NMFS").

11          6.      NMFS subsequently issued a revised Incidental Take Statement on July 19, 2019.

12          7.      This action seeks judicial relief with respect to the July 1, 2019 ROD and 2018 EIS

13  issued by the Forest Service and the Biological Opinion and Incidental Take Statements issued by

14  NMFS, ordering defendants Forest Service and NMFS, *et al*. to comply with the requirements of the

15  National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq*.; the National Forest and

16  Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq*.; Endangered Species Act ("ESA"), 16 U.S.C.

17  § 1531 *et seq*.; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

18          8.      The decision approving the Lolo Project was arbitrary and capricious, an abuse of

19  discretion, and/or otherwise not in accordance with law. The Biological Opinion and Incidental Take

20  Statements issued by NMFS resulted from a maladministration of the ESA, and the decision to issue

21  them was arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with

22  law.  As discussed below, NMFS and the Forest Service have also violated the ESA by failing to

23  reinitiate consultation under Section 7 of the ESA, 16 U.S.C. § 1536, in light of new information about

24  project impacts.

25

26

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 2

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

9.      Plaintiffs request that the Court set aside the Lolo Project ROD and EIS pursuant to 5 U.S.C. § 706(2)(a), enjoin implementation of the Project, and order NMFS and the Forest Service to reinitiate consultation under the ESA.

10.      Plaintiffs Friends of the Clearwater and Alliance for the Wild Rockies seek a declaratory judgment, injunctive relief, an award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and such other relief as this Court deems just and proper.

## II.      JURISDICTION

11.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question), 16 U.S.C. §§ 1540(c) and (g) (action arising under the ESA and ESA citizen suit provision); 5 U.S.C. §§ 701–706 (the APA).

12.      Plaintiffs submitted timely written comments and an objection concerning the Project and fully participated in the available administrative review processes, thus exhausting its administrative remedies. Defendants' issuance of the Lolo Project ROD was a final administrative action of the U.S. Forest Service within the meaning of 5 U.S.C. § 706. Thus, the Court has jurisdiction to review plaintiffs' APA claims.

13.      Plaintiffs sent a notice of intent to sue pursuant to ESA to the Secretary of the Department of Agriculture, the Secretary of the Department of Commerce, the Forest Supervisor for the Nez Perce-Clearwater National Forests, the Assistant Administrator of NMFS, and the Regional Administrator of NMFS for its West Coast Region on April 7, 2020. Thus, Plaintiffs have complied with the 60-day notice requirement set out at 16 U.S.C. §1540(g)(2)(A)(i) for citizen suits under the ESA and this Court has jurisdiction to review Plaintiffs' ESA claims. A copy of Plaintiffs' 60-day notice letter is attached to this complaint as Attachment A.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 3

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

### III.    VENUE

14.    Venue is proper in this Court under 28 U.S.C. 1391. All or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, defendants (or some of them) reside in this district, and the public lands and resources and agency records in question are located in this district.

### IV.    PARTIES

15.    Plaintiff Friends of the Clearwater is a tax-exempt, non-profit public interest organization dedicated to protecting and preserving the Idaho Clearwater Bioregion's wildlands and biodiversity. Its registered office is located in Moscow, Idaho. Friends of the Clearwater has over 800 individual members, many of whom are located in Idaho. Friends of the Clearwater brings this action on its own behalf and on behalf of its adversely affected members.

16.    Plaintiff Alliance for the Wild Rockies (the "Alliance") is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the northern Rockies bio-region; its native plant, fish, and animal life; and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Idaho. The Alliance brings this action on its own behalf and on behalf of its adversely affected members.

17.    Defendant United States Forest Service is an administrative agency within the U.S. Department of Agriculture and is responsible for the lawful management of our national forests, including the Nez Perce-Clearwater National Forest.

18.    Defendant Vicki Christiansen is named in her official capacity as Chief of the Forest Service.

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

19.     Defendant Cheryl Probert is named in her official capacity as Forest Supervisor of the Nez Perce-Clearwater National Forests. Ms. Probert's predecessor Kurtis Steele issued the ROD for the Project on July 1, 2019.

20.     Defendant Leanne Marten is named in her capacity as the Regional Forester for the Northern Regional Office, which is Region 1 of the U.S. Forest Service. In that capacity, she is charged with ultimate responsibility for ensuring that decisions made at each national forest in the Northern Region, including the Nez Perce-Clearwater National Forests, are consistent with applicable laws, regulations, and official policies and procedures.

21.     Defendant NMFS is an administrative agency within the U.S. Department of Commerce and is responsible for the lawful management of our Nation's ocean resources and their habitat, including anadromous steelhead.

## V.     STATEMENT OF STANDING

22.     The interests at stake in this matter are germane to Plaintiffs' organizational purposes. Defendants' failure to prepare a lawful EIS; failure to take a hard look at Eldorado Creek; and violations of the Forest Plan and the agency's own regulations will harm plant, fish and animal life and natural ecosystems in the Nez Perce-Clearwater National Forest and thereby injure Plaintiffs' members who use and enjoy those resources.

23.     Plaintiffs and their members observe, use, enjoy, and appreciate Idaho's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Clearwater National Forest. Members use and enjoy the waters, public lands, and natural resources throughout areas covered by the Project for work, recreational, scientific, spiritual, educational, aesthetic, and other purposes. Plaintiffs' members enjoy fishing, hiking, camping, hunting, skiing, bird watching, study, contemplation, photography, and other

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 5

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

1  activities in and around the waters and public lands throughout the Project area. Plaintiffs and their

2  members also participate in information gathering and dissemination, education and public outreach,

3  commenting upon proposed agency actions, and other activities relating to the Forest Service's

4  management and administration of these public lands.

5      24.     Defendants' unlawful actions adversely affect Plaintiffs' organizational interests, as

6  well as their members' use and enjoyment of the Clearwater National Forest, including the Project

7  area. The interests of Plaintiffs and their members have been and will continue to be injured and

8  harmed by the Forest Service's actions and/or inactions as complained of herein. Unless the relief

9  prayed for herein is granted, Plaintiffs and their members will continue to suffer ongoing and

10  irreparable harm and injury to their interests.

11      25.     The injuries to Plaintiffs are likely to be redressed by a favorable decision of this Court

12  because Plaintiffs are seeking an order declaring that Defendants have violated the NEPA, NFMA,

13  ESA, and the APA and enjoining the Forest Service from implementation of the Project. That would,

14  in turn, protect and preserve the natural areas and plant, fish and animal species the Plaintiffs' members

15  use and enjoy until such time as the Forest Service proposes a project that complies with federal law.

## VI.     FACTUAL ALLEGATIONS

### A.     The Affected Area

26.     The Project Area is located within the Lolo Creek watershed, approximately 16 miles

northeast of Kamiah, Idaho, in Idaho County.

27.     The Lolo Creek Watershed includes the Musselshell Creek, upper Lolo Creek, Yoosa

Creek, Eldorado Creek, Yakus Creek, Molly Creek, and Mud Creek watersheds.

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

28.     The Lolo Creek watershed is a place of dense, moist forests of ancient fir and cedar, parted by crisp, cool streams. It is a landscape where gray wolves, fisher, pine martens, lynx, and bears roam through the cover of mature forests.

29.     The Lolo Creek watershed is blessed with a rich environment and spectacular natural beauty. Wildlife abounds. The project area supports crucial populations of threatened and endangered fish, birds, and animals.

30.     The Lolo Creek Watershed provides critical habitat for federally threatened Snake River Basin steelhead and essential fish habitat for Pacific Coast Salmon.

31.     The July 1, 2019 ROD included, as Appendix B, a June 20, 2019 Biological Opinion and Incidental Take Statement issued by NMFS.

32.      NMFS subsequently released a revised Incidental Take Statement on July 19, 2019.

33.     The Biological Opinion states: "Twenty-one small culverts have been identified for replacement and are all on non-fish bearing streams. There are two culvert replacements that are within 600 feet of occupied steelhead designated critical habitat on Lolo Creek."

34.     The Biological Opinion further states: "There are 21 culvert replacements and two are within 600 feet of occupied steelhead habitat in Upper Lolo Creek."

35.     Table 2 of the Biological Opinion lists the culvert replacements by subwatershed. Biological Opinion at 8.

36.     After the Final ROD was signed on July 1, 2019, the Forest Service authorized three additional culvert replacements within the Project boundary.

37.     The three additional culvert replacements authorized within the Project boundary after the issuance of the Final ROD, Biological Opinion, Incidental Take Statement, and Revised Incidental Take Statement are the White Creek, Mike White Creek, and Nevada Creek culvert replacements.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 7

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

38.     All three of these new culverts are in or near Snake River steelhead habitat and would adversely affect Snake River Basin steelhead and their critical habitat downstream of the culvert replacement project sites.

39.     The Forest Service had consulted with NMFS on 21 culverts for the Project, but the three new culverts were not among them. Consequently, NMFS' June 20, 2019 Biological Opinion and ITS and July 19, 2019 Revised ITS do not address and cannot have addressed the impacts of the additional culvert replacements on steelhead.

40.     The Revised ITS notes specifically that sedimentation caused by culvert replacements is likely to adversely affect the species.

41.     The Biological Opinion purports to describe "the present condition of the Snake River Basin steelhead distinct population segment (DPS)." Biological Opinion at 25.

42.     As described in the Biological Opinion:

a.     The Snake River Basin steelhead was listed as a threatened ESU on August 18, 1997 (62 FR 43937), with a revised listing as a DPS on January 5, 2006 (71 FR 834).

b.     This DPS occupies the Snake River basin, which drains portions of southeastern Washington, northeastern Oregon, and north/central Idaho.

c.     Reasons for the decline of this species include substantial modification of the seaward migration corridor by hydroelectric power development on the mainstem Snake and Columbia Rivers, and widespread habitat degradation and reduced streamflows throughout the Snake River basin.

d.     Another major concern for the species is the threat to genetic integrity from past and present hatchery practices, and the high proportion of hatchery fish in the aggregate run of Snake River Basin steelhead over Lower Granite Dam.

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

43.     The Biological Opinion further states: "On May 26, 2016, in the agency's most recent 5-year review for Pacific salmon and steelhead, NMFS concluded that the species should remain listed as threatened (81 FR 33468)."

44.     The "most recent 5-year review for Pacific Salmon and steelhead" was released in 2016 and was based on data collected no later than 2015.

45.     In 2014 to 2015, NMFS estimated that 45,789 Snake River Basin steelhead returned to their natal waters in the Snake River Basin. This was the highest number of returning steelhead since NMFS began collecting data on returning Snake River Basin steelhead in the mid-1980s.

46.     By contrast, in 2018 to 2019, NMFS estimated that 8,182 Snake River Basin steelhead returned to their natal waters in the Snake River Basin. This was the lowest number of returning steelhead since the mid-1990s.

47.     The data on steelhead numbers considered by NMFS in the Biological Opinion was collected during a 30-year high, but more recent data that was available to NMFS at the time of the Biological Opinion shows that returning steelhead numbers were at a 25-year low when the Biological Opinion was issued.

48.     NMFS used and relied upon outdated, stale information showing record high numbers of returning steelhead to support its "no jeopardy" determination, ignoring more recent data showing that returning steelhead numbers were at a record low.

49.     NMFS and the Forest Service did not reinitiate consultation as required by 50 C.F.R. § 402.16(a)(2), even though new information revealed effects of the action that will affect steelhead and their critical habitat to a greater extent than previously considered.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 9

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

50.     NMFS and the Forest Service did not reinitiate consultation as required by 50 C.F.R. § 402.16(a)(3), even though the action was subsequently modified in a manner that causes an effect to steelhead that was not considered in the biological opinion.

51.     The Lolo Creek population of steelhead is a part of the Clearwater steelhead Major Population Group within the Snake River Basin Distinct Population Segment.

52.     Even though the Biological Opinion was examining stale 30-year high return numbers, the Biological Opinion noted that the Lolo Creek population of steelhead is at high risk for extinction.

53.     The extinction risk for the Lolo Creek population of steelhead was significantly understated because NMFS did not consider more recent data showing that returning steelhead were actually at a 25-year low when the Biological Opinion was released.

54.     The Lolo Creek steelhead population includes Lolo Creek and all of its tributaries.

55.     The Lolo Creek steelhead population must stay at a moderate risk of extinction or higher in terms of overall viability rating to achieve recovery of the Snake River Basin Distinct Population Segment. Biological Opinion at 28.

56.     The entire Lolo Creek watershed has been identified as a major spawning area for Snake River Basin steelhead.

57.     Lolo Creek is the only major spawning area for the Lolo Creek steelhead population.

58.     Sediment is a limiting factor for the Lolo Creek steelhead population.

59.     Spawning and rearing habitat quality in tributary streams in the Snake River varies from excellent in wilderness and roadless areas to poor in areas subject to intensive human land uses, including logging.

60.     Steelhead known occupied habitat or designated critical habitat is present 600 feet or less downstream from six of the 21 culvert replacement sites described in the EIS.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 10

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

1  61.   Designated critical habitat for steelhead occurs in all four project subwatersheds

2  (Upper Lolo Creek, Mussellshell Creek, Eldorado Creek, and Middle Lolo Creek subwatersheds)

3  affected by the Project as shown on the following map, which was included in the Biological Opinion

4  as Figure 9:



25  62.   The land management plan that is applicable to the Lolo Project area is the Clearwater

26  Forest Plan.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 11

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

**B.     The Lolo Project**

63.     The Forest Service's Lolo Insect and Disease Project will allow, among other things, logging, road building, culvert replacements, and burning in the Lochsa-Powell Ranger District of the Clearwater National Forest.

64.     On February 16, 2018, the Forest Service issued a Draft Environmental Impact Statement (DEIS) for the Lolo Project.

65.     Plaintiffs submitted timely comments to the DEIS on April 2, 2018.

66.     On August 10, 2018, the Forest Service issued its "first" Final Environmental Impact Statement ("FEIS") and a Draft ROD for the Lolo Project.

67.     Plaintiffs submitted timely objections to this "first" FEIS and Draft ROD on September 24, 2018.

68.     On March 29, 2019, the Forest Service issued a second FEIS for the Lolo Project. No opportunity was provided for public comments on, or objections to, this second FEIS.

69.     On July 1, 2019, the Forest Service issued a Final Record of Decision ("ROD") approving the Lolo Project.

70.     The ROD adopted Alternative 5 from the FEIS, with certain modifications.

71.     Alternative 5, as modified by the ROD, includes logging approximately 43.8 million board feet on 3,387 acres of the Project area, much of which will be clearcut and burned; temporary road construction; new system road construction; skid trail construction; road modifications, maintenance, and conditioning; and replacing culverts.

72.     Alternative 5, as modified by the ROD, includes the replacement of 21 culverts in the Project area.

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

73.     The FEIS fails to demonstrate consistency with Forest Plan direction and the Region 1 Soil Quality Standards by failing to accurately disclose the existing amount of detrimental soil disturbance ("DSD") within each activity area, failing to provide accurate estimates of DSD that would be attributable to project activities, and failing to provide reliable estimates of cumulative, post-project DSD in activity areas.

74.     These Regional Soil Quality Standards require that detrimental management effects (*e.g.,* compaction, displacement, rutting, severe burning, surface erosion, and mass wasting) to the soil resource not exceed 15 percent of an activity area and that retention of coarse woody material be appropriate for the habitat type.

75.     In areas already exceeding 15 percent detrimental soil conditions as a result of prior activities, the Region 1 Soil Quality Standards state that the cumulative detrimental effects from project implementation, including restoration, should not exceed the conditions prior to the planned activity and should move toward a net improvement in soil quality.

76.     The FEIS states that there "are 16 units (831 acres) in the Musselshell Meadows vicinity (Figure 18) proposed for harvest, all of which have existing impacts and the proposed activities will initially cause cumulative predicted detrimental disturbance to exceed the threshold of 15%. . . . In addition to the Musselshell units . . . there are 8 proposed units where cumulative DSD is predicted to be above 15% at the completion of proposed harvest activities."

77.     The Clearwater Forest Plan describes forest-wide standards and criteria for water resources at Appendix K.

78.     The Clearwater Forest Plan and a court-approved settlement agreement outlined in the Stipulation of Dismissal of *The Wilderness Society v. Robertson*, No. 93–0043–S–HLR (D. Idaho 1993) (the "TWS Settlement") require that, for stream drainages not currently meeting Forest Plan

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 13

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

standards, the Forest Service may not permit projects that result in a measurable increase in sediment production. *See Wilderness Soc. v. Bosworth*, 118 F. Supp. 2d 1082, 1103 (D. Mont. 2000) ("Under the TWS Settlement agreement, the Clearwater National Forest agreed to 'proceed only with those projects that would result in no measurable increase in sediment production in drainages currently not meeting Forest Plan Standards'").

79.     The FEIS states that Eldorado Creek is currently meeting the Forest Plan standards for sedimentation, thus avoiding the prohibitions in the Forest Plan and the TWS Settlement on making a bad sedimentation problem worse.

80.     But the Forest Service measured "cobble embeddedness" (a measure of sedimentation) in the wrong place. The Forest Service took measurements and samples at the mouth of Eldorado Creek (below Dollar Creek) where the stream is described in the Forest Plan as a "Type C" channel but is, in fact, a "Type B" channel.

81.     The Forest Plan describes Eldorado Creek as having a "Type C" channel in the reach from its mouth to the point where Dollar Creek flows into it, and a "Type B" channel in the reach above Dollar Creek.

82.     A "stream reach" is defined as a "length of stream channel generally uniform with respect to discharge and structure." Forest Plan at VI-31.

83.     The Forest Plan defines the "key reach" of a stream as a "representative stream segment that can be expected to be sensitive to water resource changes and which adequately reflects the effects of management of the stream channel, the water, and their beneficial uses." Forest Plan at VI-13. The key reach of streams is "near mouth, unless specified." Forest Plan Appendix K, p. K-8.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 14

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

84. Type B channels are "moderate energy" stream segments and moderately steep with better sediment mobility and sediment flushing than Type C channels, which are "low energy" stream segments and slower with more sediment retention.

85. Even though the sampled reach of Eldorado Creek is listed as a Type C channel in the Forest Plan, and even though the "key reach" is "near mouth, unless specified," the point right at the mouth of Eldorado Creek is not representative of a Type C channel, but rather represents a Type B channel.

86. As Type B channels flush sediment better than Type C channels, by taking samples at the mouth of Eldorado Creek the Forest Service sampled a non-representative stream segment that is less sensitive to water resource changes than other locations near the mouth and does not adequately reflect the effects of management in the Type C reach.

87. The Forest Service has not shown that it is meeting the sedimentation/cobble embeddedness maximum in the Type C Eldorado Creek reach, has not taken a hard look at the existing condition of Eldorado Creek, and has not taken a hard look at the Project's sediment impacts to Eldorado Creek.

88. For its entire length, Eldorado Creek must meet the "high fishable" standard for maximum short-term sediment loading, which, for steelhead, means that Eldorado Creek cannot exceed 50% sediment loading in its Type C reach or 55% sediment loading in its Type B reach "for more than 10 out of 30 years."

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 7 OF THE ESA
### Failure to Reinitiate Consultation

89. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

**Bricklin & Newman, LLP**
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel. (206) 264-8600
Fax. (206) 264-9300

90.     Pursuant to Section 7 of the ESA and 50 C.F.R. § 402.16, Defendants have a duty to reinitiate consultation when new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered or when the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence.

91.     The duty to reinitiate consultation in these circumstances falls on both NMFS, as the consulting agency, and the Forest Service, as the action agency.

92.     In this case, the duty to reinitiate consultation was triggered by (a) new information relating to the recent dramatic decline in Snake River Basin steelhead numbers, and (b) the addition of new culvert replacements within the project boundary, which are likely to affect the species in a manner and extent not previously considered.

93.     Neither the Forest Service nor NMFS reinitiated consultation on the Project after new information came to light and the Project was modified to add new culvert replacements.

94.     Defendants' actions as described above violated the ESA and its implementing regulations.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE ESA AND THE APA
### Failure to Use Best Available Science and Data in the Biological Opinion and Incidental Take Statement

95.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

96.     In preparing the 2019 Biological Opinion and Incidental Take Statement, NMFS used a status review of steelhead which was published in 2016 and relied upon 2015 data.

97.     There has been a serious decline of annual adult steelhead counts since 2016, especially in Lolo Creek, and NMFS did not consider or incorporate this more recent data.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 16

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

98.     The failure of NMFS to use the best available science and data to assess the status of threatened Snake River basin steelhead and set a baseline constitutes a maladministration of the ESA, in violation of the APA.

99.     Defendant NMFS's actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF SECTION 9  OF THE ESA
### Unlawful Take of ESA-Listed Species

100.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

101.    The failure of NMFS and the Forest Service to reinitiate consultation renders the Revised Incidental Take Statement invalid such that it no longer provides a safe harbor to the Forest Service for the taking of Snake River Basin steelhead.

102.    The Forest Service, relying on the invalid ITS, plans to engage or is engaged in activities that will result in the taking of Snake River Basin steelhead.

103.    That taking is unlawful and in violation of Section 9 of the ESA.

104.    Defendant Forest Service's actions as described above violated the ESA and its implementing regulations.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF NFMA AND THE APA
### Failure to Comply with the Clearwater Forest Plan's Sedimentation Standards

105.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

106.    NFMA mandates that Defendant's activities carried out on National Forests must be consistent with the applicable land management plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(e).

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

107.     The Clearwater Forest Plan and the TWS Settlement require that, for stream drainages not currently meeting Forest Plan standards, the Forest Service may not permit projects that result in a measurable increase in sediment production.

108.     Defendants sampled a non-representative segment of Eldorado Creek that is less sensitive to water resource changes than other locations and does not adequately reflect the effects of management in Eldorado Creek.

109.     Defendants measured cobble embeddedness in Eldorado Creek at the wrong place, in an unlawful attempt to avoid the prohibitions in the Forest Plan and the TWS Settlement on making a bad sedimentation problem in Eldorado Creek worse.

110.     The Forest Service has not shown that it is meeting the sedimentation/cobble embeddedness maximum set out in the Forest Plan in the Type C Eldorado Creek reach.

111.     Defendants' actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF NEPA AND THE APA
### Failure to take Hard Look at Impacts to Eldorado Creek and Snake River Basin Steelhead

112.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

113.     The National Environmental Policy Act of 1969, commonly known as NEPA, is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2006).

114.     NEPA requires federal agencies "to the fullest extent possible" to prepare an environmental impact statement (EIS) for every major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Under NEPA, an EIS must take a hard look at environmental impacts, which includes considering all foreseeable direct and indirect impacts, without improperly minimizing negative side effects. An EIS must take a hard look at "[t]he degree to which the action may adversely affect an endangered or threatened species." 40 C.F.R. § 1508.27(b)(9).

115.    By measuring cobble embeddedness at the wrong place in Eldorado Creek, Defendants failed to take a hard look at the existing condition of Eldorado Creek, failed to take a hard look at the Project's significant adverse environmental impacts to Eldorado Creek, and failed to provide a full and fair discussion of those impacts.

116.    By failing to take a hard look at the Project's significant adverse environmental impacts to Eldorado Creek, Defendants failed to take a hard look at the Project's adverse impacts to Snake River Basin steelhead and failed to provide a full and fair discussion of those impacts.

117.    Defendants' actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF NFMA AND THE APA**
**Failure to Comply with the Clearwater Forest Plan's Soil Quality Standards**

</div>

118.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

119.    NFMA mandates that Defendant's activities carried out on National Forests must be consistent with the applicable land management plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(e).

120.    Region 1 Soil Quality Standards require that detrimental soil disturbance (DSD) not exceed 15 percent of an activity area. In areas exceeding 15 percent DSD as a result of prior activities, the cumulative detrimental effects from project implementation, including restoration, should not

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 19

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

exceed the condition existing prior to the planned activity and should move toward a net improvement in soil quality.

121.     The FEIS admits that there "are 16 units (831 acres) in the Musselshell Meadows vicinity (Figure 18) proposed for harvest, all of which have existing impacts and the proposed activities will initially cause cumulative predicted detrimental disturbance to exceed the threshold of 15%. [. . .] In addition to the Musselshell units [. . .] there are 8 proposed units where cumulative DSD is predicted to be above 15% at the completion of proposed harvest activities."

122.     Defendants' actions as described above are arbitrary, capricious, not in accordance with law, and without observance of procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

## VIII.   PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.     Order, declare, and adjudge that the Defendants have violated the National Environmental Policy Act, the Administrative Procedure Act, and their implementing regulations as set forth above;

B.     Order, declare, and adjudge that the Defendants have violated the National Forest Management Act, the Administrative Procedure Act, and their implementing regulations as set forth above;

C.     Order, declare, and adjudge that the Defendants have violated the Endangered Species Act, the Administrative Procedure Act, and their implementing regulations as set forth above;

D.     Enjoin the Defendants from implementation of the Project;

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

1       E.      Order the Defendants to withdraw the Final Environmental Impact Statement, Record

2   of Decision, Biological Opinion, and Incidental Take Statement until such time as Defendants

3   demonstrate to this Court that they have adequately complied with the law;

4       F.      Award the Plaintiffs their costs, litigation expenses, expert witness fees, and reasonable

5   attorneys' fees associated with this litigation pursuant to the Endangered Species Act, the Equal

6

7   Access to Justice Act, and all other applicable authorities; and

8       G.      Grant the Plaintiffs any such further relief as may be just, proper, and equitable.

9       Dated this 25th day of June, 2020.

10

11

           Respectfully submitted,

           BRICKLIN & NEWMAN, LLP

12

13   By:   /s/ David A. Bricklin
       By:   /s/ Bryan Telegin

14   By:   /s/ Zachary K. Griefen
       David A. Bricklin, ID Bar No. 8565

15   Bryan Telegin, WSBA No. 46686*
       Zachary K. Griefen, WSBA No. 48608*

16   1424 Fourth Avenue, Suite 500
       Seattle, WA  98101

17   Telephone:  206-264-8600

18   Facsimile:  206-264-9300
       E-mail: bricklin@bnd-law.com

19   E-mail: telegin@bnd-law.com
       E-mail: griefen@bnd-law.com

20

21   *Counsel for Plaintiffs Friends of the
     Clearwater and Alliance for the Wild Rockies*

22

23   *Applications for the admission pro hac vice
    of attorneys Telegin and Griefen will be filed
    promptly.

24

25

26

Bricklin & Newman, LLP
Attorneys at Law
1424 Fourth Avenue, Suite 500
Seattle WA 98101
Tel.  (206) 264-8600
Fax.  (206) 264-9300

# ATTACHMENT A



BRICKLIN & NEWMAN LLP

*lawyers working for the environment*

Reply to:  Seattle Office

April 7, 2020

*VIA CERTIFIED U.S. MAIL*
*RETURN RECEIPT REQUESTED*

Sonny Perdue, Secretary
U.S. Department of Agriculture
1400 Independence Ave. SW
Washington, D.C. 20250

Chris Oliver, Assistant Administrator
NOAA Fisheries
1401 Constitution Ave N.W., Room 5128
Washington, DC 20230

Wilbur Ross, Secretary
Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230

Barry Thom, Regional Administrator
NOAA Fisheries - West Coast Region
1201 Northeast Lloyd Boulevard, Suite 1100
Portland, OR 97232

Cheryl Probert, Forest Supervisor
Nez Perce-Clearwater National Forests
903 3rd Street
Kamiah, Idaho 83536

**RE:  Notice of Intent to Sue under the Endangered Species Act**

Dear Secretary Perdue, Secretary Ross, and Officials of the U.S. Forest Service and NOAA Fisheries:

On behalf of Friends of the Clearwater and Alliance for the Wild Rockies, the purpose of this letter is to notify you of violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, concerning your failure to reinitiate formal consultation under Section 7 of the ESA with respect to the Forest Service's recent approval of the Lolo Insect and Disease Project ("Project"). NOAA Fisheries ("NMFS") issued a Biological Opinion and Incidental Take Statement ("ITS") for that project on June 20, 2019, and a Revised ITS on July 19, 2019. The purpose of Section 7 consultation was to evaluate impacts of the Project on Snake River Basin steelhead.

In 1997, Snake River Basin steelhead were listed as threatened under the ESA. Since that time, their numbers have continued to decline due to hydroelectric dams on the Snake and Columbia Rivers and widespread habitat degradation throughout the Snake River basin. Designated critical habitat for Snake River Basin steelhead occurs in all four of the subwatersheds affected by the Project (*i.e.*, the Upper Lolo Creek, Mussellshell Creek, Eldorado Creek, and Middle Lolo Creek subwatersheds). In this case, the Biological Opinion, ITS, and Revised ITS determined that the Project would adversely affect this species and its designated critical habitat. The adverse effects

Secretary Sonny Perdue, et al.
April 7, 2020
Page 2

are primarily due to (1) turbidity plumes caused by ongoing road use for harvest activities near streams and (2) sedimentation of stream beds caused by culvert removals, culvert replacements, and road use or reconstruction near streams[1]

Notwithstanding the prior Section 7 consultation on the effects of the Project, it is clear that NMFS and the Forest service are currently violating the ESA by failing to reinitiate their consultation. Pursuant to 50 C.F.R. § 402.16, the agencies have a duty to reinitiate consultation in two relevant circumstances. The first is when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2). The second is when "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." *Id.* at (a)(3). The duty to reinitiate Section 7 consultation in these circumstances falls on both NMFS and the Forest Service. *See, e.g., Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008) (duty to reinitiate consultation lies with both the action agency and the consulting agency).

In this case, the duty to reinitiate Section 7 consultation is triggered by (a) new information relating to the recent dramatic decline in Snake River Basin steelhead numbers, and (b) the addition of new culvert replacements within the project boundary, which are likely to affect the species in a manner and extent not previously considered. If NMFS and the Forest Service do not reinitiate consultation within 60 days of receiving this letter, Friends of the Clearwater and Alliance for the Wild Rockies intend to initiate a lawsuit to remedy these violations.

In addition, the failure of NMFS and the Forest Service to reinitiate consultation in these circumstances renders the ITS invalid such that it no longer provides a safe harbor to the Forest Service for the taking of Snake River Basin steelhead. If the Forest Service, relying on the invalid ITS, engages in activities that will result in the taking of Snake River Basin steelhead, that taking is unlawful and in violation of Section 9 of the ESA. To the extent the Forest Service is taking Snake River Basin steelhead in the Project area prior to the completion of reinitiated consultation and a new ITS, Friends of the Clearwater and Alliance for the Wild Rockies intend to file a lawsuit under Section 9 of the ESA, alleging an unlawful take of ESA-listed species.

The violations alleged above are described in more detail below.

### A.    Dramatic Decline in Steelhead Numbers

In considering effects of the Project in its 2019 Biological Opinion, ITS, and Revised ITS, NMFS used and considered a status review of steelhead populations which was published in 2016 and relied upon 2015 data. It was this status review from which the biological opinion obtained its baseline data for steelhead numbers in the Project area. The data in this status review indicated

---

[1] The Revised ITS admits that the Project will take steelhead, stating: "The proposed action is reasonably certain to result in incidental take of ESA-listed species . . . incidental take would occur as follows . . . (2) Harm of juvenile steelhead from sedimentation of substrate below areas associated with construction activities for culvert removals/replacements near streams[.]"

Secretary Sonny Perdue, et al.
April 7, 2020
Page 3

that steelhead numbers were at a 30-year high, suggesting they would be much more resilient to impacts from the Project.

But there has been a serious decline of annual adult steelhead counts since 2016, especially in Lolo Creek, and NMFS did not consider this more recent data. Moreover, unlike the 2015 data cited in the biological opinion, this more recent data indicates that Snake River Basin steelhead populations are currently at a 25-year low. *See* Eric Barker, *Low steelhead numbers prompt review*, LEWISTON TRIBUNE, Nov. 5, 2019. As noted in an October 23, 2019 letter from NMFS Regional Administrator Barry Thom to officials at the U.S. Army Corps of Engineers, U.S. Bureau of Reclamation, and Bonneville Power Administration (attached to this notice letter for convenience), "[i]n 2014-15, an estimated 45,789 naturally produced steelhead passed Lower Granite Dam [the highest number since this data series began in the mid-1980s], five years later, only 8,182 passed the project [the lowest return since the 1994-95 and 1995-96 migrations]." This is obviously a stark contrast with the data cited in the biological opinion, and suggests that Snake River Basin steelhead may be far more sensitive to impacts.

As the data on steelhead numbers considered by NMFS was collected during a 30-year high, but more recent data from 2018 shows that steelhead numbers are currently at a 25-year low, the Project—which both NMFS and Forest Service admit will take steelhead—may affect steelhead or steelhead critical habitat in a manner or to an extent not previously considered by NMFS. See 50 C.F.R. § 402.16(a)(2). Reinitiation of Section 7 consultation is, therefore, required. The Project cannot legally go forward without a new biological opinion based on current data and a current understanding of the precipitous decline of Snake River Basin steelhead.

In considering your response to this allegation, please be aware that the post-2015 steelhead data is "new" for the purposes of the ESA even if it existed at the time the BiOp and ITS were drafted—and even if the Forest Service was aware of the data at the time of the initial consultation—because the Forest Service did not provide this information to NMFS and NMFS did not consider it. *See Pacificans for a Scenic Coast v. California Dep't of Transportation*, 204 F. Supp. 3d 1075, 1092–93 (N.D. Cal. 2016) (requiring reinitiation under 50 C.F.R. § 402.16(a)(2) where action agency knew of relevant information but failed to disclose it during the initial consultation process).

B.     **Additional Culverts**

In addition to new information about the recent, dramatic decline in Snake River Basin steelhead, reinitiation of Section 7 consultation is also required due to the addition of culvert crossings in the Project boundary. Approximately 40 days after the Final ROD was signed on July 1, 2019, a Forest Service biologist informed FOC that the Forest Service planned to authorize 22 additional culvert replacements within the Project boundary. The Forest Service has since reduced the number of additional culverts to three: the White Creek, Mike White Creek, and Nevada Creek culverts. All three of these new culverts are in or near Snake River steelhead habitat and would adversely affect Snake River Basin steelhead and their critical habitat downstream of the culvert replacement project sites. The Forest Service had consulted with NMFS on 21 culverts for the Project, but the three new culverts were not among them. Consequently, NMFS' June 20, 2019 Biological Opinion

Secretary Sonny Perdue, et al.
April 7, 2020
Page 4


and ITS and July 19, 2019 Revised ITS do not address and cannot have addressed the impacts of the additional culvert replacements on steelhead. This, in turn, is highly significant, as the Revised ITS notes specifically that sedimentation caused by culvert replacements is likely to adversely affect the species.

Under 50 C.F.R. § 402.16(a)(2), the new culvert replacements represent "new information" that triggers a duty to reinitiate consultation between the Forest Service and NMFS, because the new information "reveals effects on the [listed species] that are different or more extensive than those that [NMFS] previously considered." *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 120 F. Supp. 2d 1005, 1025 (M.D. Fla. 2000). Obviously, if 21 culvert replacements are likely to adversely affect the species, 24 culvert replacements are likely to do so to an even greater degree.

Alternatively, under 50 C.F.R. § 402.16(a)(3) the Forest Service and NMFS were required to reinitiate consultation in light of the Forest Service's "subsequent modification" of the Project by adding to the number of culvert replacements within the Project boundary. *See, e.g.*, *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 629 F. Supp. 2d 1123, 1133 (E.D. Cal. 2009) ("An agency must also reinitiate consultation when new information reveals effects not previously considered, when the action is subsequently modified in a way not considered in the BiOp, or when a new species is listed.").[2] Twenty-four culvert replacements are more than the 21 culvert replacements that NMFS assumed in its Biological Opinion and ITS, in which NMFS concluded that even 21 replacements would harm steelhead. NMFS' BiOp "must be coextensive with the agency action." *Conner v. Burford*, 848 F.2d 1441, 1457–58 (9th Cir. 1988). *See also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 981 (9th Cir. 2006) ("If future actions differ from the BiOp assumptions, BLM must reinitiate consultation with the [Services].").

The triggering of a duty to reinitiate consultation under either 50 C.F.R. § 402.16(a)(2) or (a)(3) renders the BiOp and ITS no longer valid, halting the Project until a new BiOp is issued.[3] Because

---

[2] *See also Sw. Ctr. For Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1142 (S.D. Cal. 2006), *appeal dismissed and remanded*, 409 F. App'x 143 (9th Cir. 2011) ("The ESA does not permit the incremental-step approach of consultation because biological opinions must be coextensive with the agency action. . . . This rule ensures that the ESA is enforced in an effective manner because "impermissible segmentation would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species.")(internal quotations and citations omitted).

[3] *See, e.g., Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1132 (N.D. Cal. 2017), *modified sub nom. Tribe v. U.S. Bureau of Reclamation*, No. 3:16-CV-04294-WHO, 2017 WL 6055456 (N.D. Cal. Mar. 24, 2017), *order clarified sub nom. Tribe v. Nat'l Marine Fisheries Serv.*, No. 16-CV-04294-WHO, 2018 WL 2010980 (N.D. Cal. Apr. 30, 2018) (quoting and citing *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992), for the proposition that "[r]einitiation of consultation requires the Fish and Wildlife Service to issue a new Biological Opinion before a project may go forward."); *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir. 1994) ("The Forest Service has not reinitiated consultation as required under § 7(a)(2). . . . accordingly, we reverse the district court's denial of an injunction barring all ongoing and announced activities that may affect the Snake River chinook from going forward. The Forest Service cannot go forward with these activities without first complying with the consultation requirements of the ESA.").

Secretary Sonny Perdue, et al.
April 7, 2020
Page 5


NMFS did not consider the effect of the three additional culvert replacements, "it cannot be determined whether the proposed project will result in a violation of the ESA's substantive provisions and cause jeopardy" to steelhead. *Hoopa Valley Tribe*, 230 F. Supp. 3d at1134–35. Reinitiation is required.

### C.      Unlawful Taking of Snake River Basin Steelhead

Section 9 of the Endangered Species Act provides that "with respect to any endangered species of fish or wildlife . . . it is unlawful for any person . . . to take any such species." 16 U.S.C. § 1538(a)(1)(B). Take is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Through regulations, the term "harm" is defined as "an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3. Section 9's prohibition on taking listed species is not absolute, a person may obtain an Incidental Take Permit under ESA Section 10 and a federal agency may obtain an ITS allowing it to take endangered species during the proposed action if the taking will not jeopardize the continued existence of any listed species and is incidental to the purpose of the action. But the absence of either of those safe harbors, any taking of listing species is flatly prohibited.

When the duty to reinitiate consultation is triggered, the prior Biological Opinion and ITS are rendered invalid and provide no safe harbor for the taking of listed species. As it has already been determined that the Project will result in the taking of Snake River Basin steelhead, the Project cannot go forward unless and until the Forest Service and NMFS comply with their substantive duty to "'insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification' of critical habitat of such species. 16 U.S.C. § 1536(a)(2)." *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1078–79 (9th Cir. 2001).

The Forest Service may already be taking action "on the ground" that harms (*i.e.*, takes) steelhead, including by causing "sedimentation of substrate below areas associated with construction activities for culvert removals/replacements near streams." July 19, 2019 NMFS Revisions to the Incidental Take Statement, at 79. NMFS has already determined that such action will result in a taking of steelhead and the ITS providing the Forest Service with a safe harbor from liability for the take of steelhead is invalid. Therefore, to the extent that the Forest Service is taking action (or will take action prior to the completion of the reinitiated consultation and NMFS' issuance of a new ITS), the Forest Service is unlawfully taking steelhead in violation of Section 9 of the ESA.

Friends of the Clearwater and Alliance for the Wild Rockies anticipate that during the 60-day period when the Forest Service and NMFS consider this notice, and before Friends of the Clearwater and Alliance for the Wild Rockies choose whether to file suit, that the Forest Service and NMFS may wish to meet and confer with Friends of the Clearwater and Alliance for the Wild Rockies as to the violations of the ESA alleged in this notice. Friends of the Clearwater and

Secretary Sonny Perdue, et al.
April 7, 2020
Page 6


Alliance for the Wild Rockies welcome such an engagement. Please feel free to contact Bricklin & Newman, LLP if the Forest Service and/or NMFS are interested in meeting, or if you have any questions or concerns about this notice of intent to sue.

Thank you for your attention to this important matter. If you would like to discuss this matter, please feel free to contact us at the phone number listed above, or at the following email addresses: bricklin@bnd-law.com, telegin@bnd-law.com, and griefen@bnd-law.com.

Very truly yours,

BRICKLIN & NEWMAN, LLP

David A. Bricklin
Bryan Telegin
Zachary K. Griefen

*Attorneys for Friends of the Clearwater
and Alliance for the Wild Rockies*


cc:     Clients



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
West Coast Region
1201 NE Lloyd Boulevard, Suite 1100
PORTLAND, OREGON 97232

October 23, 2019

Beth Coffey, Director of Programs
U.S. Army Corps of Engineers
Northwestern Division
P.O. Box 2870
Portland, OR 97208-2870

Lorri Gray, Regional Director
U.S. Bureau of Reclamation
Pacific Northwest Regional Office
1150 North Curtis Road, Suite 100
Boise, ID 83706-1234

Elliot Mainzer, Administrator
Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208-3621

Dear Ms. Coffey, Ms. Gray and Mr. Mainzer:

RE:    Recent average abundance of Snake River steelhead relative to the Adaptive Management
       Implementation Plan Early Warning Indicators.

In consultation with your agencies, NOAA Fisheries adopted abundance-based Early Warning
Indicators and Significant Decline Triggers as part of an Adaptive Management Implementation
Plan (AMIP) which was first incorporated into the 2010 Supplemental Federal Columbia River
Power System Biological Opinion (May 20, 2010). Consistent with the AMIP, and after receiving
input from the Regional Implementation and Oversight Group (RIOG), an abundance and trend
(rate of decline) metric was formally added on December 13, 2010. The AMIP, including both the
Early Warning and Significant Decline triggers and the abundance and trend metric, was also
included in the 2014 and 2019 biological opinions on the operation of the Columbia River System.

The purpose of this letter is to inform you that the Early Warning Indicator (based on the abundance
and trend metrics) has been triggered for Snake River (SR) steelhead based on the run
reconstruction estimates of natural origin adult steelhead at Lower Granite Dam, as updated to
include the 2018-19 migration (Figure 1). This indicator is triggered if the four-year average
abundance falls below the lowest 50 percent of returns, <u>and</u> the trend in abundance (defined as the
slope of the last five years of annual abundance estimates) falls into the lowest ten percent
abundance trends in the base period (i.e., if 90 percent of the slopes were more positive than this
number). For SR steelhead, the corresponding AMIP abundance and trend metrics are a four-year
average abundance of 17,975 and a slope of -0.233. The four-year average abundance of SR
steelhead ending in 2018-19 is 17,705 (less than the 50th percentile) and the trend has a slope of 0.-
408 (more negative than the lowest 10th percentile abundance trend).[1]

---

[1] Upper Columbia and Middle Columbia River (Yakima River Major Population Group) steelhead are experiencing
similar declines in average abundance and abundance trends, but did not trigger the early warning indicator using
the base periods established pursuant to the 2009 AMIP.



2

The 4-year average abundance (17,705) is well above the abundance based 20th percentile Early Warning and 10th percentile Significant Decline triggers. As intended, the trend (slope) indicator, is highly sensitive to declining abundance. In 2014-15, an estimated 45,789 naturally produced steelhead passed Lower Granite Dam [the highest number since this data series began in the mid-1980s], five years later, only 8,182 passed the project [the lowest return since the 1994-95 and 1995-96 migrations]. The high return in 2014-15, coupled with the poor ocean conditions experienced beginning with the 2015 smolt outmigration, appear to be the primary cause for this indicator being triggered as Columbia River System operations, harvest, and other potential causative factors have been relatively stable during this period.

**Figure 1.  Proportion exceedance for four-year average abundance and five-year trends (slope) for Snake River spring-summer Chinook salmon, fall Chinook salmon, and steelhead (at Lower Granite Dam); Upper Columbia River spring Chinook salmon (at Rock Island Dam) and steelhead (at Priest Rapids Dam); and Mid-Columbia River steelhead (Yakima MPG) compared to AMIP Early Warning and Significant Decline Triggers.**



Based on these findings, NOAA Fisheries believes that further consideration is warranted and propose that we implement the AMIP process triggered by this Early Warning Indicator for SR steelhead to determine 1) if there is a likelihood of triggering the Significant Decline Trigger in the next one to two years, and 2) if additional actions are warranted to further protect the

3

species. This would need to be accomplished in 120 days per the AMIP procedures.[2] Our approach consists of the following steps.

1) Evaluate the status of Snake River steelhead, including estimating a new four-year average abundance estimate, by mid-January, after the 2019 dam counts are available (about 90 percent of SR steelhead pass Lower Granite Dam by December 31 each year), assuming recent ratios of naturally produced adult estimates to total dam counts.

2) Determine the potential (the abundance required) for reaching the Significant Decline Trigger in 2019-20 or 2020-21.  This analysis would be based on previous year's abundance, coupled with any preseason forecast information that may be available, including relevant ocean condition indicators.

3) If the analysis reveals a likelihood of reaching the Significant Decline Trigger in 2019-20 or 2020-21, initiate a review of potential Rapid Response Actions and initiate appropriate actions as outlined in the AMIP.

Please let me know if you concur with the approach.  We will inform the RIOG of this event and share the results of our analysis under actions 1 and 2 above as soon as they are available.

Also, we note that several Rapid Response Actions identified in the AMIP, which are likely to increase abundance and productivity, or have the potential to do so, have already been implemented in recent years. First, in 2019 the Action Agencies implemented the flexible spill operation at the eight mainstem lower Snake and lower Columbia River Dams, generally increasing spill levels, which some hypothesize will reduce latent mortality and thereby improve productivity by 25 percent or more (see our 2019 CRSO biological opinion). Second, the transport start date was moved earlier beginning in 2018 (from May 1 to April 24) which increases the rate at which steelhead are transported. Because transported steelhead often return at higher rates than bypassed fish, this would be expected to increase adult steelhead returns (see 2019 CRSO biological opinion). Lastly, harvest managers curtailed recreational steelhead fisheries in 2019 beyond what was required by the sliding scale harvest agreement.

Please contact Ritchie Graves of my staff if you have any questions.

Sincerely,

Barry A. Thom
Regional Administrator

---

[2] An Early Warning Indicator: This indicator will alert NOAA Fisheries and the Action Agencies to a decline in a species' abundance level for natural-origin adults that warrants further scrutiny because it indicates that a Significant Decline (see below) may be reached in one to two years. The indicator for each species will be a running four-year mean of adult abundances that falls below a 20% likelihood of occurrence.

Within 120 days of NOAA Fisheries' determining that the Early Warning Indicator abundance levels have been observed, the Action Agencies, in coordination with NOAA Fisheries, the RIOG, and other regional parties will determine whether the species in question is likely to decline to a level that will trip the Significant Decline Trigger. This evaluation will be based on additional indicators and predictors of status (e.g., jack counts, ocean conditions, and habitat disturbances). If the early implementation of Rapid Response Action(s) is warranted, the evaluation will determine which actions to take. The Action Agencies will implement the Rapid Response Actions as soon as practicable, but no later than 12 months from the date the indicator is observed. [2009 AMIP, p. 12]