UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FRIENDS OF THE CLEARWATER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, et al.,<br><br>Defendants. | Case No. 3:20-cv-00322-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiffs, Friends of the Clearwater and Alliance for the Wild Rockies, bring this action against various federal defendants, including the United States Forest Service (FS) and NOAA-Fisheries (also known as National Marine Fisheries Service or NMFS), challenging the approval of the Lolo Insect and Disease Project. Plaintiffs claim that the Record of Decision issued by the FS violates the Endangered Species Act (ESA), the National Forest Management Act (NFMA), and the National Environmental Policy Act (NEPA).

Currently pending before the Court are the parties' cross motions for summary judgment (Dkts. 21, 26). Also before the Court is Defendants' motion to

strike (Dkt. 25).  For the reasons discussed below, the Court grants in part and denies in part Plaintiffs' motion for summary judgment; grants in part and denies in part Defendants' motion for summary judgment; and grants in part and denies in part Defendants' motion to strike.

## BACKGROUND

The Lolo Insect and Disease Project is located in the Nez Perce-Clearwater National Forests. The Project includes logging approximately 43.8 million board feet on 3,387 acres of the Project area (much of which will be clear-cut and burned); temporary road construction; new system road construction; skid trail construction; road modifications; and replacement of 21 culverts. (FS 6-7, 90.) The Project area includes four subwatersheds—Middle Lolo Creek, Upper Lolo Creek, Eldorado Creek, and Musselshell Creek—all of which are designated as critical habitat for Snake River Basin steelhead. (AR FS 81.) Further, many of the haul roads that are planned for the Project are immediately adjacent to this critical habitat. (FS 52, 60, 81.)

The impact of the Project on the Snake River Basin steelhead is at the core of this case. Steelhead, an anadromous fish, spend most of their adult life in the ocean but return to inland waters to spawn. (FS 11657.) The Snake River Basin steelhead is a distinct population segment (DPS) that has been listed as threatened under the ESA since 1997, as revised in 2006. (FS 66.) The reasons for the decline

of the Snake River Basin steelhead include substantial modifications of the seaward migration corridor by hydroelectric power development on the Snake River and Columbia River, and widespread habitat degradation and streamflow reductions throughout the Snake River Basin. (*Id.*)

The Snake River Basin steelhead, in turn, consists of individual populations organized into five Major Populations Groups (MPGs), each of which occupy different geographic areas and watersheds. Those MPGs are the Clearwater River, Salmon River, Grande Ronde River, Imnaha River, and the Lower Snake River. (FS 66-67.) Maintaining the health of these MPGs is important to survival of the species. "To be considered viable [a DPS] should have multiple viable populations so that a single catastrophic event is less likely to cause the [DPS] to become extinct . . . . The risk level of the [DPS] is built up from the aggregate risk levels of the individual populations and [MPGs] that make up the [DPS]." (FS 66.)

Four of the five MPGs in the Snake River Basin DPS are not meeting viability objectives, including the Clearwater River MPG, which will be directly impacted by the Project. (FS 67, 68.) Further, all five of the populations within the Clearwater River MPG are already at either moderate risk or high risk of extinction. (FS 68.)

The Lolo Creek population is one of the five populations within the

Clearwater River MPG and is currently at high risk of extinction. It is this population that will be most significantly impacted by the project. (FS 68, 69.) This population is, in turn, the most significant population for the survival of the species—indeed, this population "must reach viable or highly viable status for recovery"—and the Lolo Creek watershed is considered the only major spawning area for this population. (FS 68, 69, 117.) In other words, maintaining the species requires protection of the Clearwater River MPG; protection of the Clearwater MPG requires protection of the Lolo Creek population; and the Lolo Creek population, which has a viability rating of "high risk," will be directly impacted by the Project.

NMFS determined in its Biological Opinion (BiOp) that the Project was likely to have adverse impacts on the local steelhead populations, including sedimentation of the streambeds where steelhead spawn and grow, and harm to juvenile steelhead from increased turbidity. (FS 103, 119.) NMFS concluded, however, that the Project "is not likely to jeopardize the continued existence of steelhead, or destroy or adversely modify their designated critical habitat." (FS 119.) The FS concluded, similarly, that the "project is designed to have no long term adverse effects on listed species [including steelhead] or their habitat." (FS 354.)

In reaching its conclusion, the NMFS relied in part on data from 2011-2015 indicating that steelhead numbers were at a 30-year high. Specifically, in addressing steelhead abundance and productivity, the NMFS noted that at the time of listing, the five-year mean abundance of natural-origin steelhead was 11,462 adults, but that counts had increased since then, reaching between 23,000 and 44,000 adult natural-origin steelhead in the five years of 2011-2015. (FS 68.)

The BiOp was issued on June 20, 2019 (FS 35) and the FS issued its ROD approving the Project on July 1, 2019 (FS 1). Around this time, the NMFS had collected or received new data showing that there was a sharp decline in steelhead abundance in 2018-2019. (Dkt. 1 at 23-31; NMFS 1276-78.) This new data, which is set forth in a letter dated October 23, 2019, from Barry A Thom, Regional Administrator of NMFS (the Thom letter), states that an "Early Warning Indicator (based on the abundance and trend metrics) has been triggered for Snake River (SR) steelhead based on the run reconstruction estimates of natural origin adult steelhead . . . as updated to include the 2018-2019 migration," and that, whereas in "2014-15, an estimated 45,789 naturally produced steelhead passed Lower Granite Dam [the highest number since this data series began in the mid-1980s], five years later, only 8,182 passed the project [the lowest return since the 1994-95 and 1995-96 migrations]. . . ." (NMFS 12477.)

In April 2020, Plaintiffs notified the FS and NMFS of this new data and requested that NMFS and the FS reinitiate consultation and issue a new BiOp under Section 7 of the ESA on the ground that the recent decline in steelhead numbers represented "new information" that the Project "may affect listed species or critical habitat in a manner or to an extent not previously considered," under 50 C.F.R. § 402.16(a)(2). (*See* Dkt. 1 at 23-31.)

Plaintiffs also notified the FS and NMFS that consultation should also be reinitiated on the ground that the FS had added additional culvert replacements to the Project subsequent to NMFS's issuance of the BiOp, and those additional culverts will have additional impacts on the species. (*Id.*) Specifically, Plaintiffs explained that after the Final ROD was signed on July 1, 2019, the FS authorized three additional culvert replacements within the Project area—the White Creek culvert, the Mike White Creek culvert, and the Nevada Creek culvert. All three of these culverts are in or near Snake River Basin steelhead habitat and the record establishes that culvert replacements adversely impact the species. (*See* FS 119 (stating that incidental take of juvenile steelhead would occur as a result of activities for culvert removals/replacements).) Plaintiffs took the position that consultation between the FS and NMFS did not include these three additional culverts and thus did not address the impacts on the steelhead of these three culvert

replacements.

On June 4, 2020, the FS and NMFS informed Plaintiff that they declined to reinitiate consultation to reevaluate the Project. Plaintiffs filed this lawsuit shortly thereafter.

## MOTION TO STRIKE

Defendants move to strike declarations of Jeremiah Busch and Al Espinosa, which were submitted by Plaintiffs in support of summary judgment, and to strike Plaintiffs' reliance on those declarations in their briefing on summary judgment. Defendants contend (1) that judicial review under the APA is limited to the administrative record that was before the agency and that Plaintiffs have failed to show that supplementation of the administrative record is warranted; and (2) that Plaintiffs' claims against NMFS are not ESA citizen-suit claims. For the reasons discussed below, the motion will be granted in part and denied in part.

A.    **Plaintiffs' claims against the FS for failure to reinitiate consultation under the ESA are not subject to the requirements of the APA and are not limited to the administrative record.**

Plaintiffs bring claims under the ESA's citizen suit provision, alleging that Defendants failed to reinitiate consultation as required under ESA § 7 as a result of new information showing a significant drop in the steelhead returns and a change to the Project. The APA requirements are not relevant to these ESA claims "because the ESA provides for a private right of action outside of the APA." *Nat'l*

*Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 911 n.5 (9th Cir. 2020). Thus, the Court can look outside of the administrative record and consider the declarations submitted by Plaintiffs for the purpose of reviewing Plaintiffs' ESA claims. *See id.* at n.11 (considering a report that was not in the administrative record for the limited purpose of reviewing ESA claim); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011)("[W]e may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim.").

### B.   Plaintiffs' claims against the NMFS for failure to reinitiate consultation must be brought under the APA.

Defendants admit that Plaintiffs' ESA claims for failure to reinitiate consultation can be maintained against the FS. However, Defendants contend that an ESA failure to reinitiate claim is not cognizable as against NMFS, as the consulting agency. The Court agrees and holds that NMFS, as an administrator of the ESA, is not subject to suit under the ESA for failure to reinitiate consultation. [1]

---

[1] Plaintiffs cite to *WildEarth Guardians v. U.S. Forest Serv.*, No. 1:19-CV-00203-CWD, 2020 WL 2239975, at *5 (D. Idaho May 7, 2020), in support of their position that their failure to reinitiate claim against NMFS may be brought under the ESA. Plaintiffs' reliance is misplaced. Although *WildEarth* held that both the Service (there the Fish and Wildlife Service) and the agency had an obligation to reinitiate consultation, it did not address whether a claim for failure to reinitiate (Continued)

*See Bennett v. Spear*, 520 U.S. 154, 174 (1997) (ESA does not provide right to bring citizen suits against an administrator of the ESA for "failure to perform [its] duties as administrator of the ESA"); *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1116 (N.D. Cal. 2017) (a plaintiff cannot maintain an ESA citizen suit against the NMFS for failure to reinitiate consultation), *modified sub nom. Tribe v. U.S. Bureau of Reclamation*, No. 3:16-CV-04294-WHO, 2017 WL 6055456 (N.D. Cal. Mar. 24, 2017), *order clarified sub nom. Tribe v. Nat'l Marine Fisheries Serv.*, No. 16-CV-04294-WHO, 2018 WL 2010980 (N.D. Cal. Apr. 30, 2018); *Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, 460 (N.D. Cal. 2017), *order clarified sub nom. Tribe v. United States Bureau of Reclamation*, 319 F. Supp. 3d 1168 (N.D. Cal. 2018) (same).

Plaintiffs may, however, maintain a failure to reinitiate claim against NMFS under the APA. *See Hoopa Valley Tribe*, 230 F. Supp. 3d at 1125 ("While the reinitiation claim against the Bureau may be brought under the ESA, as discussed

---

can be brought against the FWS under the ESA. *See id.* Indeed, a review of the briefing in *WildEarth* demonstrates that the FWS argued only that it was not subject to suit for failure to reinitiate consultation because the agency, and not FWS, had sole authority to reinitiate consultation. The briefing did not address the propriety of bringing the claim against the FWS under the APA as opposed to the ESA. (*See* Case No. 1:19-CV-00203-CWD, Dkt. 28 at 2, Dkt. 28-1 at 12-18, Dkt. 30 at 2-7.)

with regard to the motion to dismiss, the claim against NMFS may only be brought under the APA.").

Defendants seek to have the Court find that Plaintiffs have waived their right to bring the failure to reinitiate claim against NMFS under the APA, pointing out that Plaintiffs have consistently maintained that the claim was brought under the ESA. Although this argument has some merit,[2] the Court finds that the allegations in the Complaint are sufficiently broad to encompass a claim under the APA and declines to find that Plaintiffs have waived their right to bring the claim against NMFS under the APA (rather than the ESA).

Finally, the Court holds that the declarations can be considered in addressing the APA claim against NMFS for failure to reinitiate consultation. In so holding, the Court acknowledges that the claim is subject to the APA arbitrary and capricious standard of review. However, where, as here, the claim is that the agency failed to act in violation of a legal obligation, review is not limited to the administrative record. *See San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) ("[G]enerally judicial review of agency action is based on a set

---

[2] In both the Complaint (Dkt 1 at 15) and the Litigation Plan (Dkt 15 at 2), Plaintiffs stated that both their failure to reinitiate consultation claim was brought under the ESA.

administrative record. However, when a court considers a claim that an agency has failed to act in violation of a legal obligation, 'review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record.' "); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (Where a plaintiff seeks to compel agency action unlawfully withheld, "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record."); *cf. Kraayenbrink*, 632 F.3d at 497 ("we may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim"); *Nat. Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465, 500 (E.D. Cal. 2018) ("This Court agrees with the reasoning provided by the district courts in *Yurok Tribe* and *Hoopa Valley Tribe* both of which held that while the APA's standard of review applies to claims arising directly under the ESA because the ESA provides no standard of review, the APA's record review limitations do not apply, so evidence outside the administrative record may be considered."). [3]

---

[3] Defendants argue that even if Plaintiffs can proceed against NMFS under the APA, the claim fails because NMFS does not have the duty or authority to reinitiate consultation. Defendants' argument is inconsistent with binding precedent and accordingly is rejected. *See Salmon Spawning & Recovery All. v.* (Continued)

## MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Because this is an administrative record review case, the Court may grant summary judgment to either party based upon a review of the administrative record. *Id.*

Under the APA, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider,

---

*Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008) ("The duty to reinitiate consultation lies with both the action agency and the consulting agency."); *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1076-77 (9th Cir. 2004) (holding that discovery of new facts "mandates reinitiating formal consultations" and that "[the consulting agency] was obligated to reinitiate consultation pursuant to 50 C.F.R. Section 402.16"); *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) ("The duty to reinitiate consultation lies with both the action agency and the consultation agency."); *see also* 50 C.F.R. § 402.16(a) ("Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and" one of the delineated circumstances exist, including "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered.").

entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996). An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Id*.

An agency must set forth clearly the grounds on which it acted. *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973). A court may not accept an agency's post hoc rationalizations for its action. *State Farm*, 463 U.S. at 50 (citation omitted). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id*. (citations omitted).

### B.     Claim 1: Failure to reinitiate § 7 consultation under the ESA

Under § 7 of the ESA, each federal agency is required to ensure that its activities are not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat. *See* 16 U.S.C. § 1536(a)(2). Federal agencies are to review their actions "at

the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a); *see* 16 U.S.C. § 1536(a). If an action "may affect" a listed species, the agency must engage in formal consultation with the U.S. Fish and Wildlife Service or NMFS, depending on the species at issue. 50 C.F.R. §§ 402.02, 402.14(a). This consultation process in turn results in a Biological Opinion issued by the consulted Service "detailing how the agency action affects the species or its critical habitat" and, if jeopardy or adverse modification is found, the Service is to suggest "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).

The ESA also imposes a continuing obligation to reinitiate consultation under four circumstances, two of which are relevant to the present case: (1) "If new information reveals effects of the action that may affect listed Species or critical habitat in a manner or to an extent not previously considered"; or (2) "If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." 50 C.F.R. § 402.16(a)(2), (a)(3).

Plaintiffs contend that Defendants were required to reinitiate consultation under these provisions of the ESA and yet failed to do so. Specifically, Plaintiffs contend that reinitiation was required because new information revealed effects of

the action that may impact the species in a manner or extent not previously considered by the FS and NMFS, and because the Lolo Project was subsequently modified in a way that cased an impact to the species not considered in the BiOp.

### 1. New Information

Plaintiffs contend that reinitiation of consultation was required because new information set forth in the Thom Letter showed a sharp decline in the number of Snake River steelhead returning to the Project area, and that this sharp decline increased the Project's relative impacts on the steelhead species in a manner that was not considered in the BiOp. Plaintiffs contend that the BiOp "paints a rosy picture of steelhead returning at record high numbers" and that, in issuing the BiOp, NMFS relied on stale, outdated data from 2011-2015. That outdated data showed that numbers of Snake River Basin steelhead returning from the ocean had increased to the highest number since the mid-1980s. However, by 2019, as set forth in the Thom Letter, the steelhead return numbers had dropped dramatically to only 8,182, which was the lowest return since 1994-95 and 1995-96.

The record demonstrates that the BiOp did not consider the information in the Thom Letter. However, Defendants contend that reinitiation was not required because NMFS repeatedly evaluated declining steelhead abundance in relation to the Project's effects on the Lolo Creek population.  Additionally, the BiOp factored into its analysis the fact that the Lolo Creek population was already

declining and "high risk"—which is the highest risk category—and still concluded that the effects from the Project would not be substantial enough to negatively influence the viability of the Lolo Creek population.

The Court finds Defendants' decision to not reinitiate consultation to be arbitrary and capricious. First, the fact that the Lolo Creek population was already declining and already in the "high risk" category does not mean that the population could not decline even further and the risk to that population thus become even greater. Thus, for example, if a "high risk" steelhead population has 100 spawning individuals, and a proposed project will kill a significant percentage of those individuals, although the population would be in the "high risk" category in both scenarios, the risk to the population of 100 is much different than the risk to the population if it significantly declines below that number. (*See* NMFS at 12228 (noting that the Lolo Creek population "may be as few as 100-200 wild fish in recent years" and that this information was not cited in, and to some extent was not available, at the time of the BiOp); Dkt. 21-2 at 3-8 ("In general, the persistence of isolated salmonid populations appears to be relatively unaffected as long as populations exceed 100 individuals. . . . However, once populations number less than 50 individuals, prospects for the persistence of populations decline precipitously."); Dkt. 21-4 at 2 ("[T]he effects of the Lolo Project on Snake River

basin steelhead could be much worse, and are likely to affect these steelhead in a manner or to an extent not considered in the 2019 Biological Opinion, in light of the new data showing drastically reduced numbers of returning steelhead."); Dkt. 29-1 at 8-13 ("Recent (2017-2019) steelhead returns to the Snake River Basin, Clearwater River Basin, and Lolo Creek have declined precipitously from the 2014-2016 counts used in the Biological Opinion analysis and suggest that Clearwater steelhead populations, particularly the unique and cherished B-run life history, are entering an extinction vortex and are increasingly at risk of imminent extinction.").) Thus, the fact that the Lolo Creek population was already declining and at high risk does not provide a satisfactory explanation for why Defendants did not reinitiate consultation based on the new data that there was a recent dramatic drop in steelhead returns.

Second, that the Lolo Creek population was declining and at high risk at a time when there were record high returns of steelhead would indicate that the new information of a recent dramatic drop in the steelhead returns would raise even graver concerns regarding the potential negative impact of the Project on the continuing viability of the imperiled Lolo Creek population. (*See, e.g.,* Dkt. 29-1 at 7, 12-13 ("If the Lolo Project had occurred in 2014–2015, at the recent highpoint in Snake and Clearwater river steelhead abundance, the impacts on the larger

population may have been less; however, if the Project occurs at an historic low point in steelhead abundance, as presently occurs, its adverse impacts could lead to total loss of the Lolo Creek steelhead population.").)  Thus, again, Defendants' reliance on the fact that the BiOp already considered that the Lolo Creek population was declining and at "high risk" does not provide a satisfactory explanation for why Defendants did not reinitiate consultation based on the new data that there was a recent dramatic drop in steelhead returns.

Third, Defendants assert that NMFS was aware of and considered the more recent reductions in abundance of the DPS, and that the no-jeopardy determination was based on the expected effectiveness of conservation measures to ensure the Project would not reduce the viability of the Lolo Creek population. In support, Defendants cite NMFS 12490, 11786-87, 11834-35. These citations merely demonstrate that the general low and declining abundance of the Lolo Creek population, and the high risk of that population, was considered in the BiOp. Moreover, the BiOp explicitly recognizes that the Project would result in the taking of juvenile steelhead. (NMFS 11836 ("The proposed action is reasonably certain to result in incidental take of ESA-listed species . . . . [T]he proposed action includes in stream work activities that could harm juvenile steelhead . . . ." ).) The BiOp does discuss the conservation measures intended to mitigate the impacts of the

Project. However, given the already imperiled status of the Lolo Creek population, the new information of the dramatic drop in steelhead returns raise questions as to whether the conservation measures are sufficient and whether any potential taking would be tolerable. (*See, e.g.,* Dkt. 29-1 at 7, 12-13 (""[I]f the Project occurs at an historic low point in steelhead abundance, as presently occurs, its adverse impacts could lead to total loss of the Lolo Creek steelhead population.").)[4] Once again, that the BiOp already considered that the population was in decline and at high risk does not provide a satisfactory explanation for why Defendants did not reinitiate consultation based on the new data that there was a recent dramatic drop in steelhead returns.

Finally, Defendants contend that they specifically examined whether the new data set forth in the Thom Letter justified reinitiation and determined it did not. However, the explanation provided by Defendants (NMFS 12221-12228, 12489-90) simply reiterates arguments already considered by the Court and which the Court finds to be unsatisfactory. Accordingly, the Court finds Defendants' decision to not reinitiate consultation to be arbitrary and capricious and will grant

---

[4] The Court also finds Defendants' explanation that the Project is expected to only impact juveniles, rather than adults, to not provide a satisfactory explanation for why Defendants did not reinitiate consultation.

summary judgment in favor of Plaintiffs on this issue.

### 2. Modification of the Project

Plaintiffs contend that reinitiation of consultation was also required because the Lolo Project has been modified by adding three additional culvert replacements that were not considered in the BiOp.

Defendants do not deny that the three culverts were not considered in the BiOp. Defendants contend, however, that reinitiation is not required because the three additional culverts are part of a separate action (a long-term plan to replace stream crossings) not connected to or reliant on the Lolo Creek Project and thus the three culverts are not a modification of the Project.

Plaintiffs point out in response that even if the three culverts were not a modification to the Project, the three culverts were not considered in the environmental baseline of the Project and approval of these three culverts is thus new information that was not considered in the Program BiOp. Plaintiffs argue that reinitiation of consultation was thus required. The Court disagrees.

The record establishes that Defendants determined that reinitiation was not required because the effects of the three replacement culverts were fully considered in a separate consultation under the Programmatic Restoration BiOp. (*See* NMFS 12226-27.) Further, because the culverts were not approved until December 2019

under the Programmatic Restoration BiOp,[5] these culverts could not have been

considered in the Project BiOp, issued in June 2019.

The Court finds that Defendants have articulated a satisfactory explanation

for its determination that reinitiation of consultation was not required in relation to

the three replacement culverts. Accordingly, summary judgment will be granted in

favor of Defendants on this issue.

### C.    Claim 2: ESA and APA Claim for Failure to use Best Available Science and Data in the Biological Opinion and Incidental Take Statement

Under the ESA, "the best scientific and commercial data available" is to be

used in fulfilling the consultation requirements. 16 U.S.C.A. § 1536(a)(2); see 50

C.F.R. § 402.14 ("In formulating its biological opinion, any reasonable and

prudent alternatives, and any reasonable and prudent measures, the Service will use

the best scientific and commercial data available . . . .").

Plaintiffs contend that because NMFS failed to use the new data showing

significant declines in steelhead numbers, and instead used stale data showing that

---

[5] The Programmatic Restoration BiOp was issued in 2012, but the specific restoration projects to be approved thereunder were not known at the time. The purpose of the Programmatic Restoration BiOp is to "continue the removal or replacement of undersized, poorly designed or obsolete stream crossing structures," ultimately improving fish habitat.

steelhead numbers were at a 30-year record high, it did not base the BiOp on the "best scientific and commercial data available," and thus violated the ESA. The Court agrees.

Defendants point out that the record shows that Defendants sought out and received data from the most recent years, which included data from 2018, before issuing the BiOp. (NMFS 10856-10929, 11494-95, 11497, 11552.)  Defendants further contend that it was sufficient that the NMFS considered the general fluctuations in population numbers, the general decline in the Lolo Creek steelhead abundance, and the agency's most recent 5-year review. Finally, Defendants contend that NMFS did not rely on stale data but instead factored in the best available scientific data about steelhead abundance that was available at the time the BiOp was issued.

However, Defendants fail to provide any citation to the BiOp showing that NMFS actually considered the recent data showing significant declines in returns. Thus, this is not a situation where NMFS has considered the most recent data and made a determination that it was not the "best scientific data available." *Cf. San Luis & Delta-Mendota Water Auth. v. Jewell,* 747 F.3d 581, 602 (9th Cir. 2014) ("The determination of what constitutes the 'best scientific data available' belongs to the agency's 'special expertise . . . .'"). Nor is this a situation where NMFS

weighed all the record evidence and drew reasonable conclusions. *Cf. Cent. Arizona Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1543 (9th Cir. 1993) ("The administrative record reveals that EPA adequately considered the relevant factors in promulgating the Final Rule. Petitioners' essential argument does not claim that EPA failed to consider the relevant factors, but instead contends that EPA erred in its consideration of those factors. This court is not to substitute Petitioners' judgment, or its own, for that of EPA, as long as the agency's interpretation is reasonable."). Rather, this is a situation where the record indicates that NMFS failed to even consider the most recent data. This failure is arbitrary and capricious. Accordingly, the Court will grant summary judgment in favor of Plaintiffs on this claim.

### D.   Claim 3: ESA § 9 Claim for Unlawful Take of ESA-Listed Species

To be liable for an unlawful taking under § 9 of the ESA, a defendant's act must be both the proximate cause of the harm and the resulting harm must be foreseeable. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 696 n.9 (1995). Moreover, the take of a listed species that complies with the conditions of an ITS is permitted and is not unlawful. *See* 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

Here, Plaintiffs contend that, because Defendants failed to reinitiate consultation as required by § 7 of the ESA, the BiOp and Incidental Take

Statement (ITS) are invalid and that, thus, any harm to Snake River Basin steelhead is unlawful in violation of § 9 of the ESA. The Court disagrees.

Although an ITS was issued, because the Court has determined that reinitiation of consultation is required, the BiOp and the ITS are no longer valid. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1108 (9th Cir. 2012) ("When reinitiation of consultation is required, the original biological opinion loses its validity, as does its accompanying incidental take statement, which then no longer shields the action agency from penalties for takings."). However, for Defendants to be liable for § 9 taking, Plaintiffs must show that Defendants' action has actually resulted in a taking of steelhead. *See Oregon Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1005 (D. Or. 2010) (even where ITS safe harbor provision has been abrogated, a plaintiff must still demonstrate that a take has occurred). Plaintiffs have failed to meet this requirement as they have not submitted any evidence demonstrating that action by the FS has actually caused a taking to occur. Accordingly, Defendants are entitled to summary judgment on the § 9 takings claim. *See Cold Mountain v. Garber, 375 F.3d 884,* 890 (9th Cir. 2004), *as amended* (Aug. 9, 2004) (affirming grant of summary judgment in favor of government on § 9 taking claim where the plaintiff failed to establish the link between government action and an alleged taking).

### E.     Claim 4: NFMA and APA Claim for Failure to Comply with Clearwater Forest Plan's Sedimentation Standards

The Forest Plan provides that the management of "all watershed systems in the Forest that are considered important for the fishery resource" are to achieve delineated water quality objectives. (FS 11536.) To do this, the Forest Plan provides for the monitoring, analysis, and evaluation of "water quality within critical reaches of specified streams." (FS 11536.) Appendix K to the Forest Plan provides that the "Key reach is near mouth, unless specified." (FS 11773.) As to Eldorado Creek, Appendix K provides the following criteria:

| Watershed (and critical reach) | Channel Type | Indicator Species | Water Quality Objective |
|---|---|---|---|
| Eldorado Cr to Dollar Cr | C | Steelhead | High fish |
| Cedar Cr | B | Cutthroat | Moderate fish |
| Eldorado Cr abv Dollar Cr | B | Steelhead | High fish |
| Austin Cr | B | Steelhead | High fish |
| Six Bit Cr | B | Steelhead | High fish |

(FS 11776.)

Plaintiffs contend that the FS is violating the Forest Plan because it is basing its determination of cobble embeddedness based on the wrong reach of Eldorado Creek. In making this argument, Plaintiffs interpret Appendix K to indicate that the key reach of Eldorado Creek is from the mouth of Eldorado Creek to Dollar Creek.

However, the FS has interpreted Appendix K to specify that the key reach of Eldorado Creek is the default of near the mouth of the creek because no other reach

is specified. Based on this interpretation, the FS has, since 1992, measured the embeddedness at the mouth of Eldorado Creek. Based on this measurement, the FS determined that the embeddedness was 24 percent, which is well below the 30-35 percent standard required by the Forest Plan. The FS's decades-long interpretation of the Forest Plan as designating that the key reach of Eldorado Creek is near the mouth is a reasonable interpretation of Appendix K. The Court will accordingly defer to that interpretation and reject Plaintiffs' alternative interpretation. *See Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) ("[W]e give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans"); *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012)("[T]he Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference.").

Plaintiffs also point out that the FS sampling is taken in a Type B reach of Eldorado Creek, which would naturally have lower existing levels of cobble embeddedness due to the higher energy of the creek in the area flushing sediment downstream. Plaintiffs also point out that the Forest Plan's "high fishable" standard prohibits projects that would cause cobble embeddedness to rise above 35 percent in Type C reaches of Eldorado Creek. Plaintiffs argue that, as a result, the FS is not properly analyzing the sedimentation of Eldorado Creek.

Plaintiffs' argument fails to take into account the fact that the Forest Plan was subsequently amended. Specifically, the Forest Plan initially identified the reach from the headwaters of Eldorado Creek to Dollar Creek as a C Channel, and the reach above Dollar Creek as a B channel. (*See* Appendix K, FS 11776 as set forth above.) However, this portion of the Forest Plan was later amended. The reason for the amendment is stated as follows: "Site specific stream surveys indicate that stream reaches for Eldorado Creek were incorrectly defined in the Forest Plan in terms of channel type." (FS 12790.) Thus, the reach of Eldorado Creek from the mouth to Lunch Creek was designated as a B channel. (*See* FS 12656.) As a result, most of the stretch of Eldorado Creek from the mouth to Dollar Creek is now classified as a B Channel under the Forest Plan. This further undermines Plaintiffs' contention that sampling near the mouth of Eldorado Creek is not representative of the proper stretch of Eldorado Creek.

In sum, the Court finds that the FS's interpretation of the Forest Plan as specifying the key reach of Eldorado Creek being the default of near the mouth is a reasonable interpretation entitled to deference. Accordingly, the FS's embeddedness sampling near the mouth of Eldorado Creek did not violate the Forest Plan.

### F.    Claim 6: NFMA and APA Claim for Failure to Comply with Clearwater Forest Plan's Soil Quality Standards

Plaintiffs claim that the Forest Plan requires that the Lolo Project be designed to maintain soil productivity and minimize erosion, with detrimental soil disturbance not to exceed 15 percent of an activity area, and that the Lolo Project will cause DSD above 15 percent and will thus violate the Forest Plan. This argument is without merit.

The Forest Plan includes a standard to "[d]esign resource management activities to maintain soil productivity and minimize erosion." (FS 11541.) However, the Forest Plan does not, as Plaintiffs contend, include a requirement that DSD not exceed 15 percent of an activity area. Instead, this 15 percent standard is contained in the Region 1 Soil Quality Standards (FS 30856-60.) These regional soil quality standards are not part of the Forest Plan nor are they part of the regulations implemented under the NFMA. Instead, these standards are contained in the Forest Service Manual and thus do "not have the independent force and effect of law," and cannot support a claim under NFMA. *See W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) ("We hold that the [Forest Service] Manual and Handbook do not have the independent force and effect of law.").

### G.    Claim 5: NEPA and APA Claim for Failure to take Hard Look at Impacts to Eldorado Creek and Snake River Basin Steelhead

Plaintiffs contend that even if the FS technically complied with the Forest Plan, the FS still violated NEPA because it failed to take a "hard look" at the

Project's impact on Eldorado Creek and the Snake River Basin steelhead. In support, Plaintiffs raise their same arguments that the Court has already considered and rejected. The Court finds, after a consideration of the record, that the FEIS took a hard look at the environmental impacts of the Project. Accordingly, summary judgment on this claim will be granted in favor of Defendants.

## ORDER

**IT IS ORDERED that:**

1. Plaintiff's Motion for Summary Judgment (Dkt. 21) is **GRANTED** in part and **DENIED** and Defendants' Cross Motion for Summary Judgment (Dkt. 26) is **GRANTED** in part and **DENIED** in part as follows:

   a. Claim 1 – Failure to reinitiate consultation claim:

      i. Summary Judgment is **GRANTED** in favor of Plaintiff on the sharply declining steelhead populations claim.

      ii. Summary Judgment is **GRANTED** in favor of Defendants on the additional culverts claim.

   b. Claim 2 – Failure to use best available science and data claim: Summary Judgment is **GRANTED** in favor of Plaintiffs.

   c. Claim 3 – Unlawful taking claim: Summary Judgment is **GRANTED** in favor of Defendants.

    d.   Claim 4 – Forest Plan sedimentation claim: Summary Judgment is **GRANTED** in favor of Defendants.

    e.   Claim 6 – Soil quality standards claim: Summary Judgment is **GRANTED** in favor of Defendants.

    f.   Claim 5 – Failure to take hard look claim: Summary Judgment is **GRANTED** in favor of Defendants.

2. Defendant's Motion to Strike (Dkt. 25) is **GRANTED** in part and **DENIED** in part as follows: The declarations submitted by Plaintiffs can be considered only for the purpose of addressing Plaintiff's reinitiation claims.

3. Defendants are directed to withdraw their Biological Opinion, withdraw the Incidental Take Statement, reinitiate consultation, and issue a new Biological Opinion and Incidental Take Statement.

4. The FS is directed to withdraw its Initial Take Statement.

5. Implementation of the Project is STAYED pending further order of the Court.

DATED: August 4, 2021

B. Lynn Winmill
U.S. District Court Judge